UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RANDY M. CORDERO,

          Plaintiff,

    v.

NICK GUZMAN, et al.,

          Defendants.

No. 2:13-cv-1551 JAM KJN P

ORDER AND FINDINGS AND RECOMMENDATIONS

I. Introduction

      Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for summary judgment. (ECF No. 50.) Defendants move for summary judgment as to the merits of plaintiff's claims, but also on the grounds that plaintiff failed to exhaust administrative remedies.

      On February 2, 2015, plaintiff filed an opposition. (ECF No. 60.) On February 9, 2015, defendants filed a motion for an extension of time to file their reply to plaintiff's opposition. (ECF No. 61.) On February 17, 2015, defendants filed the reply. (ECF No. 62.) Good cause appearing, defendants' motion for extension of time to file the reply is granted and the reply is deemed timely filed.

      Also pending is plaintiff's motion to file an amended complaint. (ECF No. 59.)

////

1

1    After carefully reviewing the record, the undersigned recommends that defendants'

2    summary judgment motion be granted in part and denied in part.  Plaintiff's motion to amend is

3    denied.

4    II.  Legal Standard for Summary Judgment

5    Summary judgment is appropriate when it is demonstrated that the standard set forth in

6    Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

7    movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

8    judgment as a matter of law."  Fed. R. Civ. P. 56(a).

9    Under summary judgment practice, the moving party always bears the initial responsibility of

10   informing the district court of the basis for its motion, and identifying those portions of "the

11   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

12   affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

13   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

14   56(c)).

15   "Where the nonmoving party bears the burden of proof at trial, the moving party need

16   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

17   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

18   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

19   committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

20   burden of production may rely on a showing that a party who does have the trial burden cannot

21   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

22   should be entered, after adequate time for discovery and upon motion, against a party who fails to

23   make a showing sufficient to establish the existence of an element essential to that party's case,

24   and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

25   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

26   necessarily renders all other facts immaterial."  Id. at 323.

27   Consequently, if the moving party meets its initial responsibility, the burden then shifts to

28   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

1   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

2   establish the existence of such a factual dispute, the opposing party may not rely upon the

3   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

4   form of affidavits, and/or admissible discovery material in support of its contention that such a

5   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

6   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

7   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

9   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

10  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

11  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

12  1564, 1575 (9th Cir. 1990).

13        In the endeavor to establish the existence of a factual dispute, the opposing party need not

14  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

15  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

16  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

17  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

18  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

19  amendments).

20        In resolving a summary judgment motion, the court examines the pleadings, depositions,

21  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

22  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

23  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

24  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

25  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

26  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

27  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

28  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

1   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

2   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

3   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

4   　　　By contemporaneous notice provided on November 23, 2013, (ECF No. 26), plaintiff was

5   advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

6   Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

7   Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

8   III.  Plaintiff's Claims

9   　　　This action is proceeding on the original complaint filed July 16, 2013, as to defendants

10  Bugarin, Guzman, Mejia, Parra, Smith and Vincent.  (ECF No. 4.)  Plaintiff's complaint is not

11  verified.

12  　　　Plaintiff alleges that all defendants violated his constitutional rights.  Plaintiff also alleges

13  a state law claim for negligence against defendant Guzman.

14  　　　*Defendant Mejia*

15  　　　Plaintiff alleges that on November 8, 2011, at approximately 1040 hours, inmate Bonner,

16  who is African-American, assaulted plaintiff at High Desert State Prison ("HDSP").  (Id. at 4.)  In

17  response, Correctional Officer Boyd ordered the yard to "get down."  (Id.)  After the "get down"

18  order, inmate Bates, who is African-American, joined in the assault on plaintiff.  (Id.)  Inmate

19  Amparo also joined the skirmish, attempting to assist plaintiff.  (Id.)

20  　　　In response to the altercation, Correctional Officer Gardiner aimed his 40 mm launcher at

21  the right thigh of inmate Bonner and discharged one impact round.  (Id.)  This round did not

22  strike anyone.  (Id.)

23  　　　The skirmish continued until plaintiff was knocked to the ground and did not get up.  (Id.)

24  Inmates Bonner and Bates then directed their aggression toward inmate Amparo.  (Id.)  Inmate

25  Bonner then suddenly stopped fighting and laid in the prone position.  (Id.)  Inmate Bates

26  continued to strike inmate Amparo.  (Id.)

27  　　　Officer Gardiner then aimed his 40 mm launcher at the lower calf of inmate Bates, who

28  was approximately 80 feet away, and discharged one round.  (Id.)  The round struck inmate Bates

4

1  in his right foot.  (Id.)  Inmate Bates then laid in the prone position.  (Id.)

2          As a result of the altercation, plaintiff suffered injuries to his nose, left ear, head and neck.

3  (Id.)  Plaintiff was taken to Banner Lassen Hospital in Susanville, California for treatment.  (Id.)

4  While at the hospital, plaintiff told the two correctional officers escorting him that he could not

5  return to B yard because he would be assaulted by the same inmates or their associates.  (Id. at 5.)

6          Sometime later, plaintiff returned to HDSP.  (Id.)  Prior to returning to his cell, plaintiff

7  told defendant Mejia that he could not return to B yard because his safety was in jeopardy.  (Id.)

8  Defendant Mejia denied this request.  (Id.)  Defendant Mejia told plaintiff that it was getting late,

9  that it was almost shift change, and that they had been ordered to return plaintiff to B yard.  (Id.)

10          On November 9, 2011, an unidentified correctional officer came to plaintiff's cell and

11  instructed plaintiff to sign compatibility/liability waiver chronos regarding the November 8, 2011

12  incident involving inmates Bates and Bonner.  (Id.)

13      *Defendant Guzman*

14          On November 9, 2011, as plaintiff returned to his cell from medical, he was assaulted by

15  his cellmate, inmate Haxton.  (Id.)  Inmate Haxton is African-American and a known associate of

16  inmates Bates and Bonner.  (Id.)  Plaintiff and inmate Haxton were exchanging blows when

17  defendant Guzman, the Control Booth Officer, ordered the inmates in the dayroom to "get down."

18  (Id.)  Defendant Guzman was either on the telephone or distracted by the telephone at the time

19  inmate Haxton began assaulting plaintiff.  (Id.)

20          Defendant Guzman, who was approximately 45 feet away from the altercation, then aimed

21  his 50 mm launcher at plaintiff and discharged one round.  (Id.)  The round struck plaintiff in the

22  right side of plaintiff's head.  (Id.)  Plaintiff alleges that defendant Guzman intentionally aimed at

23  plaintiff's head or failed to discharge his weapon in accordance with California Department of

24  Corrections and Rehabilitation ("CDCR") policy, which mandates that officers aim for the "lower

25  zone."  (Id.)

26          As a result of being shot, plaintiff allegedly suffered a depressed cranial fracture and

27  intracranial hemorrhage, as well as brain damage that impacts plaintiff's ability to use his left

28  hand and causes vision and speech impairment.  (Id.)

*Defendant Smith*

Plaintiff alleges that on December 12, 2011, defendant Smith refused to process plaintiff's outgoing legal mail.  (<u>Id.</u> at 6.)  Defendant Smith returned to plaintiff's cell and told him, "you're lucky Rainey is nice to you, dumbass." (<u>Id.</u>)  Plaintiff alleges that defendant Smith's refusal to process his mail and derogatory statement were made in retaliation for plaintiff filing a staff complaint against defendant Guzman.  (<u>Id.</u>)

*Defendant Vincent*

Plaintiff alleges that on January 24, 2012, defendant Vincent was stationed outside the HDSP law library.  (<u>Id.</u>)  Plaintiff was using the law library in connection with his staff complaint against defendant Guzman.  (<u>Id.</u>)  During this time, defendant Vincent read plaintiff's confidential legal papers, and then began making uneducated guesses regarding plaintiff's litigation strategy. (<u>Id.</u>)  Plaintiff asked defendant Vincent to make copies of an investigative report.  (<u>Id.</u>) Defendant Vincent refused to make the requested copies.  (<u>Id.</u>)  Plaintiff alleges that defendant Vincent acted in retaliation against plaintiff for filing a staff complaint against defendant Guzman.  (<u>Id.</u>)

*Defendant Burgarin*

On February 14, 2012, plaintiff was transferred to California State Prison-Corcoran ("Corcoran").  (<u>Id.</u> at 6.)  On February 28, 2013, plaintiff informed defendant Burgarin, a Correctional Counselor, that he was in danger of being assaulted by the Two-Five prison gang and/or disruptive group.  (<u>Id.</u>)  Plaintiff attempted to give defendant Burgarin copies of CDCR 128-B chronos documenting his safety concerns with the Two-Five gang, but defendant Burgarin refused to accept them.  (<u>Id.</u>)

*Defendant Parra*

On March 5, 2013, plaintiff telephoned his attorney to discuss filing a civil suit against HDSP and defendant Guzman.  (<u>Id.</u>)  While on the telephone, plaintiff became aware that defendant Parra was monitoring the call.  (<u>Id.</u> at 6-7.)  Plaintiff also heard a distinct "click," which meant that the call was being monitored by CDCR staff.  (<u>Id.</u> at 7.)

////

1    On March 5, 2013, plaintiff was assaulted by inmates Valdivia and Trejo of the Two-Five

2    gang.  (Id.)  Inmates Valdivia and Trejo later told plaintiff that they had conspired with defendant

3    Parra to assault plaintiff.  (Id.)  They explained that defendant Parra told them that plaintiff was

4    "dropping kites" on the Two-Five gang.  (Id.)  "Dropping kites" is prison slang for providing

5    prison staff with information about the members of the gang.  (Id.)  Plaintiff alleges that

6    defendant Parra conspired with inmates Valdivia and Trejo to assault him in retaliation for filing a

7    staff complaint against defendant Guzman.  (Id.)

8    IV.  Exhaustion of Administrative Remedies

9        *Legal Standard*

10    The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be

11    brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a

12    prisoner confined in any jail, prison, or other correctional facility until such administrative

13    remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion

14    requirement applies to all inmate suits about prison life, whether they involve general

15    circumstances or particular episodes, and whether they allege excessive force or some other

16    wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

17    Proper exhaustion of available remedies is mandatory, Booth v. Churner, 532 U.S. 731,

18    741 (2001), and "[p]roper exhaustion demands compliance with an agency's deadlines and other

19    critical procedural rules[.]"  Woodford v. Ngo, 548 U.S. 81, 90 (2006).  The Supreme Court has

20    also cautioned against reading futility or other exceptions into the statutory exhaustion

21    requirement.  See Booth, 532 U.S. at 741 n.6.  Moreover, because proper exhaustion is necessary,

22    a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise

23    procedurally defective administrative grievance or appeal.  See Woodford, 548 U.S. at 90-93.

24    "[T]o properly exhaust administrative remedies prisoners 'must complete the administrative

25    review process in accordance with the applicable procedural rules,' [] - rules that are defined not

26    by the PLRA, but by the prison grievance process itself."  Jones v. Bock, 549 U.S. 199, 218

27    (2007) (quoting Woodford, 548 U.S. at 88).  See also Marella v. Terhune, 568 F.3d 1024, 1027

28    (9th Cir. 2009) ("The California prison system's requirements 'define the boundaries of proper

7

1    exhaustion.'") (quoting Jones, 549 U.S. at 218).

2            In California, prisoners may appeal "any policy, decision, action, condition, or omission

3    by the department or its staff that the inmate or parolee can demonstrate as having a material

4    adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).

5    On January 28, 2011, California prison regulations governing inmate grievances were revised.

6    Cal. Code Regs. tit. 15, § 3084.7.  Now inmates in California proceed through three levels of

7    appeal to exhaust the appeal process:  (1) formal written appeal on a CDC 602 inmate appeal

8    form, (2) second level appeal to the institution head or designee, and (3) third level appeal to the

9    Director of the California Department of Corrections and Rehabilitation ("CDCR").  Cal. Code

10   Regs. tit. 15, § 3084.7.  Under specific circumstances, the first level review may be bypassed.  Id.

11   The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a

12   prisoner's administrative remedies.  See id. § 3084.7(d)(3).  Since 2008, medical appeals have

13   been processed at the third level by the Office of Third Level Appeals for the California

14   Correctional Health Care Services.  A California prisoner is required to submit an inmate appeal

15   at the appropriate level and proceed to the highest level of review available to him.  Butler v.

16   Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir.

17   2002).  Since the 2011 revision, in submitting a grievance, an inmate is required to "list all staff

18   members involved and shall describe their involvement in the issue." Cal. Code Regs. tit. 15,

19   § 3084.2(3).  Further, the inmate must "state all facts known and available to him/her regarding

20   the issue being appealed at the time," and he or she must "describe the specific issue under appeal

21   and the relief requested." Cal. Code Regs. tit. 15, §§ 3084.2(a)(4).  An inmate now has thirty

22   calendar days to submit his or her appeal from the occurrence of the event or decision being

23   appealed, or "upon first having knowledge of the action or decision being appealed." Cal. Code

24   Regs. tit. 15, § 3084.8(b).

25           Failure to exhaust is "an affirmative defense the defendant must plead and prove." Bock,

26   549 U.S. at 204, 216.  In Albino, the Ninth Circuit agreed with the underlying panel's decision[1]

27   _____

28   [1]  See Albino v. Baca, 697 F.3d 1023, 1031 (9th Cir. 2012).  The three judge panel noted that "[a]
     defendant's burden of establishing an inmate's failure to exhaust is very low." Id. at 1031.

"that the burdens outlined in Hilao v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996), should provide the template for the burdens here." Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).  A defendant need only show "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino, 747 F.3d at 1172.  Once the defense meets its burden, the burden shifts to the plaintiff to show that the administrative remedies were unavailable.  See Albino, 697 F.3d at 1030-31.

A prisoner may be excused from complying with the PLRA's exhaustion requirement if he establishes that the existing administrative remedies were effectively unavailable to him.  See Albino, 747 F.3d at 1172-73.  When an inmate's administrative grievance is improperly rejected on procedural grounds, exhaustion may be excused as effectively unavailable.  Sapp v. Kimbrell, 623 F.3d 813, 823 (9th Cir. 2010); see also Nunez v. Duncan, 591 F.3d 1217, 1224-26 (9th Cir. 2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable"); Ward v. Chavez, 678 F.3d 1042, 1045 (9th Cir. 2012) (exhaustion excused where futile); Brown v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (plaintiff not required to proceed to third level where appeal granted at second level and no further relief was available).

Where a prison system's grievance procedures do not specify the requisite level of detail for inmate appeals, Sapp, 623 F.3d at 824, a grievance satisfies the administrative exhaustion requirement if it "alerts the prison to the nature of the wrong for which redress is sought." Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).  "A grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved.  A grievance also need not contain every fact necessary to prove each element of an eventual legal claim.  The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation." Griffin, 557 F.3d at 1120.

If under the Rule 56 summary judgment standard, the court concludes that plaintiff has failed to exhaust administrative remedies, the proper remedy is dismissal without prejudice. Wyatt v. Terhune, 315 F.3d 1108, 1120 (9th Cir. 2003), overruled on other grounds by Albino,

---

Relevant evidence includes statutes, regulations, and other official directives that explain the scope of the administrative review process.  Id. at 1032.

1   747 F.3d 1162.

2       *Background*

3       Defendants argue that plaintiff failed to exhaust his administrative remedies with respect

4   to his claims against defendant Bugarin, Mejia, Parra, Smith and Vincent, i.e., all defendants but

5   for defendant Guzman.

6       Defendants argue that between November 8, 2011, and July 16, 2013, plaintiff submitted

7   two appeals that were accepted for third level review, HDSP 11-1606 and HDSP 12-0043.  (ECF

8   No. 50-11 at 2.)  HDSP 11-1606 pertained to the November 9, 2011 incident involving defendant

9   Guzman.  (ECF No. 50-13 at 37-40.).  In HDSP 12-0043, plaintiff challenged the finding of guilty

10  in a disciplinary action based on the November 9, 2011 incident.  (Id. at 46-47.)

11      Defendants state that on March 10, 2013, plaintiff submitted appeal CSPC 13-2073

12  concerning the March 5, 2013 assault and his claims that defendant Burgarin ignored his safety

13  concerns and defendant Parra ordered his assault.  (Id. at 52-55.)  Defendants state that this appeal

14  was rejected at the Director's Level because plaintiff did not submit the necessary supporting

15  documents.  (Id. at 75.)  The appeal identifies the missing documents as "CDCR Form 837

16  Crime/Incident Report (parts A, B, & C) –all pages."  (Id.)  Defendants state that despite being

17  informed of the reasons this appeal was rejected, plaintiff did not cure the defect and resubmit the

18  appeal.

19      *Analysis—Defendants Smith and Vincent*

20      In his opposition, plaintiff argues that he was not required to file separate administrative

21  appeals with respect to his claims against defendants Smith and Vincent because his claims

22  against these defendants "derive from the same nucleus of fact" as his claim against defendant

23  Guzman.  (ECF No. 60 at 13-14, 15)

24      Administrative remedies may not be exhausted where the grievance, liberally construed,

25  does not have the same subject and same request for relief.  See Morton v. Hall, 599 F.3d 942,

26  946 (9th Cir. 2010) (grievance that complained of visitation restrictions, and did not mention an

27  assault or theorize that the visitation restriction imposed was related to the assault, was

28  insufficient to put prison officials on notice that staff conduct contributed to the assault).  HDSP

1    11-1606, the grievance challenging the shooting by defendant Guzman, did not raise plaintiff's

2    claims against defendants Smith and Vincent.  HDSP 11-1606 did not give prison officials notice

3    that plaintiff was complaining that on December 12, 2011, defendant Smith allegedly refused to

4    process his legal mail or that on January 24, 2012, defendant Vincent allegedly read plaintiff's

5    confidential legal papers and refused to make copies.  For these reasons, the undersigned finds

6    that plaintiff failed to exhaust his administrative remedies with respect to his claims against

7    defendants Smith and Vincent.

8             *Analysis—Defendant Mejia*

9             In his opposition, plaintiff argues that HDSP 11-1606 raised his claim against defendant

10   Mejia.  In his response to the denial of HDSP 11-1606 at the second level, in addition to his

11   claims against defendant Guzman, for the first time plaintiff argued that defendant Mejia and

12   another guard denied his November 8, 2011 request to be removed from B yard.  (ECF No. 50-13

13   at 40.)

14            "Administrative remedies shall not be considered exhausted relative to any new issue,

15   information, or person later named by the appellant that was not included in the originally

16   submitted [appeal] and addressed through all required levels of administrative review up to and

17   including the third level."  Cal.Code Regs. tit. 15, § 3084.1(b).  In other words, the addition of

18   plaintiff's claim against defendant Mejia in his third level appeal did not exhaust this claim

19   because new claims are not permitted as the appeal moves through the levels of review.  A

20   prisoner does not exhaust administrative remedies when he includes new issues from one level of

21   review to another.  See Sapp, 623 F.3d at 825 (concluding that it was proper for prison officials to

22   "decline[ ] to consider a complaint about [prisoner's] eye condition that he raised for the first time

23   in a second-level appeal about medical care for a skin condition."); Dawkins v. Butler, 2013 WL

24   2475870, *8 (S.D. Cal. 2013) (a claim made for the first time in plaintiff's request for Third Level

25   review was insufficient to exhaust the issue where it was not included in the original appeal).  For

26   these reasons, the undersigned finds that plaintiff failed to exhaust his administrative remedies

27   with respect to his claims against defendant Mejia.

28   *////*

1	*Analysis—Defendant Bugarin*

2	Plaintiff filed two grievances raising his claims against defendants Bugarin, i.e., grievance

3	nos. 13-2852 and 13-2073.  For the following reasons, the undersigned finds that these grievances

4	did not exhaust plaintiff's administrative remedies with respect to his claims against defendant

5	Bugarin.

6	On April 24, 2013, plaintiff submitted grievance no. 13-2852 as a staff complaint.  (ECF

7	No. 57 at 55.)  In this grievance, plaintiff alleged that on February 28, 2013, defendant Bugarin

8	conducted plaintiff's pre-committee conference for his annual review.  (Id.)  Plaintiff alleged that

9	he told defendant Bugarin about his safety concerns regarding the Two-Five gang.  (Id. at 57.)

10	Plaintiff alleged that defendant Bugarin refused to accept his documentation in support of his

11	security concerns.  (Id.)  Plaintiff alleged that on March 5, 2013, he was attacked by two members

12	of the Two-Five gang.  (Id.)

13	On April 30, 2013, grievance 13-2852 was screened out at the first level of review as

14	untimely.  (Id. at 60.)  The response stated that plaintiff's appeal was dated April 24, 2013, but

15	plaintiff was attempting to appeal an ICC action which occurred on February 28, 2013.  (Id.)  "If

16	so, you have failed to meet the allotted time constraints.  Your appeal will not be processed at this

17	time."  (Id.)

18	Plaintiff appears to have resubmitted grievance 13-2852 at the first level, arguing that his

19	appeal was intended as a "staff complaint."  (Id.)  Plaintiff argued that his grievance was not

20	untimely because he had one year from the alleged misconduct to file a staff complaint.  (Id.)  On

21	May 16, 2013, grievance 13-2852 was again rejected at the first level of review as untimely.  (Id.)

22	The undersigned considers whether prison officials should have treated grievance 13-2852

23	as a staff complaint, thus rendering it timely.  California Code of Regulations Title 15, §

24	3084.5(b)(4) describes staff complaints as appeals that allege "staff behavior or activity in

25	violation of a law, regulation, policy, or procedure or appears contrary to an ethical or

26	professional standard that could be considered misconduct as defined in subsection 3084(g)..."

27	Subsection 3084(g) describes staff misconduct as "staff behavior that violates or is contrary to

28	law, regulation, policy, procedure, or an ethical professional standard."

Based on the description of staff complaints in section 3084.5(b)(4), the undersigned finds that grievance 13-2852 was properly classified as a "regular" grievance rather than a staff complaint. Plaintiff's claims against defendant Bugarin did not involve a violation of law, regulation, policy or procedure or a violation of ethical professional standard.[2] Accordingly, grievance 13-2852 was properly rejected as untimely. For these reasons, the undersigned finds that grievance 13-2852 did not administratively exhaust plaintiff's claims against defendant Bugarin.

Plaintiff's first level grievance filed in grievance 13-2073 raised only his claims against defendant Parra. (ECF. No. 50-13 at 52, 54.) Plaintiff included his claims regarding defendant Bugarin in his appeal from the second level response to grievance 13-2073. (Id. at 55.) Because plaintiff did not include his claims regarding defendant Bugarin in the first level appeal he filed in grievance 13-2073, this grievance did not exhaust his claims against defendant Bugarin. See Cal.Code Regs. tit. 15, § 3084.1(b); Sapp, 623 F.3d at 825.

Accordingly, for the reasons discussed above, the undersigned finds that plaintiff did not exhaust his administrative remedies with respect to his claims against defendant Bugarin.

*Defendant Parra*

On March 10, 2013, plaintiff filed grievance 13-2073 raising his claims against defendant Parra. (ECF No. 57 at 75.) This grievance was processed as a staff complaint apparently based on plaintiff's allegations that defendant Parra facilitated the attack by the other inmates on plaintiff. The first level response is unclear. (Id. at 81.) However, it appears to have been granted in part. (Id.) Plaintiff's appeal was accepted at the second level of review and also granted in part. (Id. at 82.) The second level response states that on March 5, 2013, Sergeant Nadel conducted a videotaped interview with plaintiff. (Id.) The response describes plaintiff's statements made during the interview. (Id.) The response further states that the following witnesses were questioned regarding the grievance:  inmate Trejo, inmate Valdivia, Officer Uribe, Officer Trevino. (Id. at 87.) The response states that the following information was reviewed as

---

[2]  In contrast, plaintiff's grievance against defendant Guzman alleging that he violated CDCR regulations when he fired his weapon, was processed as a staff complaint. (ECF No. 57 at 47.)

1    a result of plaintiff's allegations: plaintiff's 602 and 602A, plaintiff's disability and effective

2    communication report, sign-in/out sheets for Facility 3B, and Incident Package 837 Log # COR

3    03B-13-03-0129. (Id.)

4          Plaintiff's third level appeal of grievance 13-2073 was rejected at the third level of review

5    because the appeal was missing the 837 Crime Report. (Id. at 85.)

6          In his opposition, plaintiff argues that he submitted requests to prison staff for the CDCR

7    837 incident report but received no response. (ECF No. 60 at 40.) Plaintiff also argues that he,

8    plaintiff, was not charged with a prison disciplinary for the altercation involving inmates Valdivia

9    and Trejo. (ECF No. 60. at 41.) Plaintiff argues that he would have received the CDCR 837

10   incident report had he, plaintiff, been charged with a rules violation involving that incident. (Id.)

11         The undersigned is puzzled by the fact that grievance 13-2073 was considered on the

12   merits at the second level of review, which included review of the 837 Crime Report, but rejected

13   at the third level of review based on plaintiff's failure to include the 837 Crime Report.

14   Plaintiff's statements in his opposition indicate that plaintiff did not possess a copy of the 837

15   Crime Report, suggesting that the second level reviewer independently obtained the 837 Crime

16   Report in order to evaluate plaintiff's grievance. If the second level reviewer was able to obtain

17   this report, then it is unclear why the third level reviewer could also not obtain this report, which

18   was apparently not readily available to plaintiff. Without further explanation of these apparent

19   discrepancies in review procedures between the second and third level of review, the undersigned

20   cannot determine whether 13-2073 was properly rejected at the third level of review on

21   procedural grounds. Accordingly, defendant Parra should not be granted summary judgment on

22   the grounds that plaintiff failed to exhaust administrative remedies.

23   V. Motion for Summary Judgment on the Merits

24         Because the undersigned finds that plaintiff failed to exhaust his administrative remedies

25   with respect to his claims against Bugarin, Mejia, Smith and Vincent, the undersigned does not

26   address defendants' motion for summary judgment as to plaintiff's substantive constitutional

27   claims against these defendants. The undersigned herein addresses defendants' arguments that

28   defendants Guzman and Parra are entitled to summary judgment as to plaintiff's substantive

1    constitutional and state law claims.

2         A.  Defendant Guzman

3         Plaintiff alleges that defendant Guzman used excessive force when he intentionally shot

4    plaintiff in the head during plaintiff's November 9, 2011 altercation with inmate Haxton.

5         Where prison officials are accused of using excessive physical force, the issue is "whether

6    force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

7    sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quoting Whitley v.

8    Albers, 475 U.S. 312, 320–321 (1986)).  Factors to consider in evaluating a claim of excessive

9    force in the prison context are:  (1) the extent of the injury suffered by an inmate; (2) the need for

10   the application of force; (3) the relationship between that need and the amount of force used: (4)

11   the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper

12   the severity of a forceful response.  Hudson, 503 U.S. at 7; Martinez v. Stanford, 323 F.3d 1178,

13   1184 (9th Cir. 2003).

14        Moreover, under Eighth Amendment standards, the defendant's subjective intent

15   comprises an essential element of the affirmative case.  See Wilson v. Seiter, 501 U.S. 294, 303

16   (1991); Hudson, 503 U.S. at 7.  Thus, the assertion of an excessive force claim requires the

17   plaintiff to "'put forward specific, nonconclusory factual allegations' that establish improper

18   motive."  Crawford–El v. Britton, 523 U.S. 574, 598 (1998) (quoting Siegert v. Gilley, 500 U.S.

19   226, 236 (1991) (Kennedy, J., concurring in judgment)); Jeffers v. Gomez, 267 F.3d 895, 911 (9th

20   Cir. 2001).  In other words, plaintiff must put forward evidence that the defendant was motivated

21   to cause him harm.  Jeffers, 267 F.3d at 906; see also Hudson, 503 U.S. at 7 (force is excessive if

22   it is applied "maliciously and sadistically" to cause harm but not it if is "applied in a good faith

23   effort to restore discipline.")

24        Defendants move for summary judgment on the grounds that defendant Guzman did not

25   intentionally shoot plaintiff in the head.  The undersigned begins by summarizing the evidence

26   submitted by both parties regarding this claim.

27        In support of their motion as to this claim, defendants rely on the declaration of defendant

28   Guzman, quoted herein:

15

2.   On November 9, 2011, I was the Control Booth Officer in Building 3 on Facility B at HDSP.   I was responsible for supervising the inmates in Building 3, providing gun coverage and operating the cell and building doors.

3.  Building 3 is a 270-design housing unit.  Meaning, the building is shaped like a square, with cells on three of the four sides (Sections A to C) of the building, and a dayroom area in the center. Each section has two tiers (floors) of cells.  The control booth, which is on the second level, has a view into the dayroom and all three sections.  The control booth is about fifteen to twenty feet above the ground.   The doors to the cells and building are electronically operated from the control booth.   The housing officers are usually stationed in the office below the control booth.

4.  At approximately 11:31 a.m., on November 9, 2011, I opened the entrance door to Building 3 for inmate Cordero (T-37551), who was returning from medical.  Cordero was assigned to cell 121, and inmate Haxton was his cellmate.

5. Cell 121 is in Section B of Building 3 and is the section directly across from the control booth.

6. I opened the door to cell 121.  As the door was opening, Cordero stepped in front of cell 122 and was talking to the occupants.  The telephone in the control booth rang, and I briefly turned my attention to the phone to pick it up, but the phone stopped ringing before I picked up the receiver.  I looked away from the area where Cordero was standing for only a matter of seconds.

7.  When I turned my attention back to B-section, I saw Cordero and Haxton punching each other in the head and upper-body areas in front of cell 124.

8.   I immediately activated my personal alarm and ordered the inmates to get down.  To the best of my recollection, Cordero and Haxton were the only inmates in the dayroom area.  Neither inmate complied with my order.  I grabbed the 40 mm launcher that was a couple of feet from me, went to the front left window of the control booth, and again yelled for the inmates to get down.

9.  Cordero and Haxton were still striking and punching each other, and had now moved to the area in front of the sink in B section. The inmates did not comply with my second order to get down.

10.   Despite having sounded the alarm, I did not see or hear an officer in the dayroom or respond to the incident.   Given the viciousness with which Cordero and Haxton were striking each other and their refusal to comply with my orders to get down, I aimed the launcher at Cordero's left calf and fired a single round.

11. As I fired the round, Cordero and Haxton simultaneously fell to the ground, with Haxton landing on top of Cordero.  The round struck Cordero in the head.

12.  As I reloaded the launcher, I saw Haxton sit on Cordero's back and punch him in the back of the head.  I ordered Haxton to get down, and saw Officers Green and Greer respond to the area of the incident.  The officers also ordered Haxton to get down, but Haxton did not comply and continued to punch Cordero in the back of the head.  The officers pepper sprayed Haxton in the facial area.

13.  Haxton got off of Cordero and complied with the officers' orders to get down.  He laid face down near the staircase in front of the area of cell 124.

14.  Cordero crawled to the front of the B-section shower, near cell 126, and laid his face down.

15.   Additional responding staff arrived and restrained both inmates.  Cordero appeared to be bleeding from the head, and medical staff attended to him.  He was secured to a backboard, placed on a gurney, and taken out of the building.

16.  I did not aim for Cordero's head, nor did I purposefully shoot him in the head.  As required by prison regulations, I aimed for Cordero's left calf.

17.  Based on my observation and training, I determined it was necessary to use the launcher to stop the inmates' fighting, restore order, and prevent any inmate from getting seriously hurt even though the entire incident last[ed] about a minute.  Cordero and Haxton appeared to be forcefully and viciously striking each other in the head and upper body areas.  They failed to comply with my orders to get down.  And I did not see or hear any staff in the dayroom. I did not fire the launcher on impulse or while I was distracted.   Nor did I shoot the launcher with the intention of striking Cordero.

18.  Before the incident on November 9, 2011, I was unaware of any problems or animosity between Haxton and Cordero, and Cordero never complained to me about any concerns he had about being celled with Haxton.

19.  After the incident, I was informed that the front-bead sight of the launcher was slightly bent to the left.  The front-bead sight is used to assist in marking and hitting the intended target.  I did not know that the front-bead sight was slightly bent before I shot the launcher on November 9, 2011.

20.  Based on my customary practice, I inspect all weapons and munitions in a control booth when I begin my shift.  I have no reason to believe that I did not follow my customary practice on November 9, 2011, and inspected the weapons and munitions in the control booth of Building 3.  Had I noticed that the front-bead sight was bent on November 9, 2011, I would have immediately informed my supervisor and the Armory staff, so that a replacement launcher could have been provided.

////

17

21.  I do not believe that the bent front-bead sight was a factor in Cordero being shot in the head on November 9, 2011.  I was approximately 50-60 feet away from Cordero and Haxton when I shot the launcher.  I aimed for Cordero's left calf.  Based on my experience with the 40 mm launcher, even if the front-bead sight was bent at the time I fired the launcher, it would have affected the horizontal location of where the round impacted; it would not have affected the vertical point of impact.  I inadvertently shot Cordero in the head because he and Haxton fell at the same time that I fired the round while aiming at Cordero's left calf.

(ECF No. 50-4 at 1-4.)

In his verified declaration submitted in support of his summary judgment motion, plaintiff states that he was shot by defendant Guzman while he was standing on his feet.  (ECF No. 60 at 3.)  In support of his opposition, plaintiff has provided verified declarations by several inmates who make the same observation.  Inmates Crosby, Keech, Steele, Mercado, Turner and Gonzalez all state that they saw plaintiff shot by defendant Guzman when plaintiff was "erect on his feet..." (ECF No. 57-3 at 112, 113, 114,115, 116, 117.)  These inmates state that they saw plaintiff fall to the ground after he was shot in the head.  (Id. at 112, 113, 114, 115, 116, 117.)

In his verified declaration, plaintiff also states that at no time did he strike inmate Haxton back.  (ECF No. 60 at 3.)  Inmates Crosby, Keech, Steele, Mercado, Turner and Gonzalez also all state that plaintiff "never struck the inmate back who attacked him, as Cordero was not the aggressor."  (ECF No. 57-3 at 112, 113, 114, 115, 116, 117.)

Inmates Crosby, Keech, Steele, Mercado, Turner and Gonzalez also all state that defendant Guzman did not aim for plaintiff's lower zone, as required by CDCR policy.  The undersigned agrees with defendants that these inmates were not in a position to know where defendant Guzman was aiming.  Accordingly, the undersigned does not consider this portion of their declarations.

At his deposition, plaintiff testified that he did not fight back when inmate Haxton attacked him.  (Plaintiff's deposition at 81-84.)  Plaintiff testified that he was carrying soup and ibuprofen when inmate Haxton first attacked him. (Id. at 83.)  Plaintiff testified that he was standing on his feet when defendant Guzman shot him. (Id. at 84.)   Plaintiff also testified that he felt the shot from defendant Guzman hit him almost immediately after inmate Haxton first hit

18

1  him.  (Id. at 82, 83, 89.)

2         Plaintiff testified that the incident ended after plaintiff fell to the ground.  (Id. at 89.)

3  Inmate Haxton continued to swing at plaintiff until the "cops" ran out of the office and pepper

4  sprayed both inmates.  (Id.)

5         The undersigned now turns to consideration of the Hudson factors set forth above.

6         *Extent of Injury:*  Defendants' motion does not address the extent of plaintiff's injuries.

7  However, at his deposition, plaintiff testified that he has a titanium plate covering his scalp or

8  skull where he was shot.  (Plaintiff's deposition at 92.)  Plaintiff now has difficulty using his

9  hands.  (Id. at 93.)  The left side of plaintiff's body was paralyzed for a couple of months after the

10  incident.  (Id.at 94.)   Thus, plaintiff suffered serious injuries as a result of being shot by

11  defendant.

12         *Need for Application of Force:*   The parties do not dispute that no officer responded when

13  defendant Guzman rang the alarm.  The parties do not dispute that plaintiff and inmate Haxton

14  were engaged in an altercation.  Thus, some force was required to quell the altercation.  However,

15  whether the force *needed* to be applied to *plaintiff* is disputed.  Under defendant's version of the

16  facts, force was justified on plaintiff because he was viciously striking inmate Haxton and refused

17  the get down order.

18         At his deposition and in his verified declaration submitted in support of his opposition,

19  plaintiff claims he did not fight back, although he does not dispute that he did not obey the order

20  to get down.  Plaintiff's inmate witnesses, in their verified declarations, also state that plaintiff did

21  not fight back.  In his unverified complaint, plaintiff alleges that he was shot while he and inmate

22  Haxton were "exchange blows."  For purposes of summary judgment, the undersigned credits

23  plaintiff's verified version of events.  However, at trial, plaintiff may have to explain his

24  description of events in his complaint.

25         Based on plaintiff's verified version of events, it is difficult to find that any use of force

26  on plaintiff was justified.

27         *Relationship Between Need for Force and Amount Used:*   With respect to the amount of

28  force used, the parties dispute whether defendant intended to shoot plaintiff in the head.

1   Defendant claims that he aimed for plaintiff's left calf, and fired just as plaintiff fell to the

2   ground.  Defendant claims that the shot accidentally hit plaintiff in the head as he fell.

3       Plaintiff and his witnesses claim that plaintiff was standing upright when defendant shot

4   him, i.e., not while he was falling.  If defendant shot plaintiff while he was standing, it is not

5   unreasonable to infer that he intentionally shot plaintiff in the head.

6       *Perceived Threat:*  As indicated above, the parties dispute the facts regarding the threat

7   perceived by defendant Guzman.  Defendant claims that the plaintiff and inmate Haxton were

8   fighting each other.  Plaintiff alleges that he did not fight back as inmate Haxton assaulted him.

9       *Efforts Made to Temper Severity*

10      The parties dispute whether defendant Guzman made efforts to temper the severity of the

11  force used.  Defendant Guzman claims that he aimed at plaintiff's calf, whereas plaintiff alleges

12  that defendant Guzman shot him in the head while he was standing.

13      *Motive*

14      Defendants argue that no inference can be drawn that defendant Guzman's use of force

15  was malicious or sadistic because plaintiff's evidence of motive is weak.  (ECF No. 50-1 at 20.)

16  Defendants state that the only reason plaintiff believes defendant intentionally, rather than

17  accidentally, shot him in the head is based on a "vibe" plaintiff got from defendant when he

18  returned from pill call.  (Id.)

19      As discussed above, to demonstrate improper motive, plaintiff must show that defendant

20  acted maliciously and sadistically to cause him harm.  Defendant acted maliciously and

21  sadistically to cause plaintiff harm if he intentionally shot plaintiff in the head while plaintiff was

22  being attacked by inmate Haxton.  While plaintiff may not be able to demonstrate what motivated

23  defendant to intentionally shoot him in the head, plaintiff has put forward sufficient evidence to

24  create a dispute regarding whether defendant acted maliciously and sadistically to cause him

25  harm.

26      *Conclusion*

27      Whether defendant Guzman's use of force was applied in a good faith effort to maintain

28  or restore discipline, or maliciously or sadistically to cause plaintiff harm, is disputed.  Because of

1   the disputed facts regarding this claim, the undersigned finds that defendant Guzman is not

2   entitled to summary judgment.[3]

3         B.  Defendant Parra

4         Plaintiff argues that defendant Parra had inmates Valdivia and Trejo assault plaintiff in

5   retaliation for him filing a staff complaint against defendant Guzman.

6         "Within the prison context, a viable claim of First Amendment retaliation entails five

7   basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2)

8   because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

9   exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

10  correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005).

11        Retaliatory motive may be shown by the timing of the allegedly-retaliatory act and other

12  circumstantial evidence, as well as direct evidence.  Bruce v. Ylst, 351 F.3d 1283, 1288–89 (9th

13  Cir. 2003).  However, mere speculation that defendants acted out of retaliation is not sufficient.

14  Wood v. Yordy, 753 F.3d 899, 904 (9th Cir. 2014) (citing cases) (affirming grant of summary

15  judgment where there was no evidence that defendants knew about plaintiff's prior lawsuit, or

16  that defendants' disparaging remarks were made in reference to prior lawsuit).

17        To raise a triable issue as to motive, a plaintiff must offer evidence that the defendants

18  knew about the protected speech.  Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009). In

19  addition, a plaintiff must show "either direct evidence of retaliatory motive or at least one of three

20  general types of circumstantial evidence [of that motive]."  McCollum v. California Dept. of

21  Corrections and Rehabilitation, 647 F.3d 870, 882 (9th Cir. 2011) (quoting Allen v. Iranon, 283

---

3.  The undersigned also notes another possible scenario suggested by the evidence, which is that
the bent front-bead sight caused the shot to hit plaintiff in the head, even though defendant aimed
at plaintiff's calf.  This issue has not been sufficiently addressed by the parties.
    However, according to defendant Guzman, he inspected his weapon before his shift and
apparently did not notice the bent front-bead sight.  Defendant Guzman also opines that the bent
front-bead sight did not affect his aim for plaintiff's left calf.
    Whether the bent front bead-sight affected the aim of the weapon may require the opinion
of an expert witness. Fed. R. Evid. 701, 702.  The undersigned also notes that the prison official
who took possession of the weapon after the incident noticed that the front bead sight was slightly
bent during an inspection.  (ECF No. 50-12 at 56.)  If this official noticed the bent front-bead
sight, then it is unclear why defendant Guzman did not notice it during his inspection.

F.3d 1070, 1077 (9th Cir. 2002)).  To survive summary judgment without direct evidence,

therefore, a plaintiff must "present circumstantial evidence of motive, which usually includes:  (1)

proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant]

expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the

[defendant] for the adverse ... action were false and pretextual."  McCollum, 647 F.3d at 882

(internal quotation marks and citation omitted).

        Defendants argue that there is no evidence that defendant Parra orchestrated the assault.

In support of this argument, defendants rely on the declaration of defendant Parra:

> 1.  I am employed by the California Department of Corrections and Rehabilitation (CDCR) and in March 2013, I was the Control Booth Officer in Building 2 on Facility 3B at California State Prison-Corcoran (COR).
>
> 2.  As a Control Booth Officer, I supervised the inmates in Building 2, provided gun coverage and operated the cell and building doors. Because weapons are stored in a control booth, the control booth is locked, and the Control Booth Officer is not allowed to leave his post unless there is an emergency and another officer provides coverage.  The control booth is located on the second level of a housing unit.
>
> 3.  On March 5, 2013, at about 12:40 p.m., I released a group of inmates for yard.  I saw two inmates, who I later identified as Trejo and Valdivia, coming down the B section staircase.  When they reached the ground level, they ran into cell 121 that was occupied by inmate Cordero (T-37551).  I immediately activated my alarm and yelled for the inmates to get down.
>
> 4.  Counselor Bugarin responded and also ordered the inmates to get down as he ran towards cell 121.  Cordero exited the cell and got down on the ground.  Then Validivia exited the cell, followed by Trejo and both inmates got down on the ground.
>
> 5.  The entire incident lasted less than a minute.  Because I did not have a view into cell 121 from the control booth, I did not see what occurred inside the cell.
>
> 6.  I suspected that Trejo and Validivia were members of associates of the Two-Five prison gang, that has its origins in the special needs yard (SNY), and that Cordero was a victim of gang-ordered or sanctioned hit.  I stated my belief in my incident report (CDC 837) and informed my Sergeant.
>
> 7.  Cordero alleged that I orchestrated his assault and that I ordered Trejo and Valdivia to attack him on March 5, 2013, in retaliation for his filing a lawsuit against CDCR staff at High Desert State Prison (HDSP).  This is not true.  I did not order, request or incite

Trejo or Valdivia to assault Cordero.  I was not aware of the assault before it occurred.  And I have no knowledge of why the inmates attacked Cordero, other than my suspicion that this was a "hit" by the Two-Five prison gang, as stated in my 837 report.

8.  Before receiving the complaint in this case, I was unaware that Cordero, and do no recall anyone informing me, that he was suing HDSP staff.

9. Cordero alleged that I learned of his lawsuit against HDSP when I listened in on a telephone call between him and his attorney.  This is not true.  Based on my customary practice, I do not listen in on a specific inmate's telephone conversation unless the inmate is the target of an investigation.

10.   The dayroom of Building 2 has four telephones that are available to inmates.  For safety and security reasons, the dayroom telephones are monitored and recorded, except for telephone "D," which is designated for emergency calls. In the control booth, there is a device that taps into the dayroom phones and records the conversations (except for D) that are taking place.

11.  As the Control Booth Officer, I had the capability of tapping into a specific telephone to overhear an inmate's conversation.  But my customary practice was to place the device on the random function, which tapped in the phones in a random order for a specified amount of time.  I would play the device in the background while I performed other duties and would pay attention to the conversation when I heard key words that were indicative of illegal activity or when it sounded as though the inmate was on a three-way call, which was not permitted.

12.  Unless the Investigate Service Unit informed me that an inmate was under investigation or the prison had received a complaint about an inmate making harassing calls, I did not target a specific inmate while he was on the dayroom telephone.  To the best of recollection, Cordero was not part of any investigation that would have required me to listen in on his conversations, and I would have had no reason or desire to do so.

(ECF No. 50-6 at 1-3.)

Plaintiff's opposition contains no direct evidence in support of his claim against defendant Parra.  At his deposition, plaintiff testified regarding his claim against defendant Parra.  Accordingly, the undersigned summarizes this testimony herein.

Plaintiff testified that sometime during the two months preceding March 5, 2013, although he could not remember when, defendant Parra stopped plaintiff as he was on his way to a dental appointment and said, "If you keep suing us, you're gonna have to put your boots on." (Plaintiff's deposition at 183.)  The only other lawsuit plaintiff had at the time concerned his

1  conviction.  (Id. at 185-86.)

2          Plaintiff testified that there are three reasons why he knows that defendant Parra

3  orchestrated the attack.  First, defendant let plaintiff's cellmate out of the cell last, i.e., after he

4  had let other inmates leave their cells.  (Id.)  Plaintiff argues that under these circumstances,

5  defendant Parra would had to have known that inmates Trevino and Valdivia were waiting

6  outside his cell trying to get in, because the Control Booth Officer observes the cells he wants to

7  open.  (Id. at 195-96.)

8          Plaintiff testified that the second reason he knows that Parra orchestrated the assault is that

9  he heard clicks on the phone when he was talking to the lawyer who was assisting him with his

10  lawsuit filed in Lassen County against defendant Guzman.  (Id. at 199.)  Plaintiff filed this lawsuit

11  on or about May 17, 2012.  (ECF No. 60 at 5.)  Plaintiff testified that approximately an hour or

12  two before the attack, he was talking on the phone with his lawyer.  (Plaintiff's deposition at

13  199.)  Plaintiff heard the "distinctive click sound" made when someone picks up the other line.

14  (Id.)  At that time, plaintiff looked up and saw defendant Parra looking out of the control tower at

15  plaintiff.  (Id.)  Defendant had the phone to his ear.  (Id. at 200.)  Plaintiff was not using the

16  confidential attorney phone when he made this phone call.  (Id.)  After plaintiff hung up, he told

17  defendant Parra that he knew that he had been listening in on his conversation with his attorney

18  regarding his lawsuit against High Desert State Prison.  (Id. at 202.)

19          Plaintiff testified that the third reason he knows that defendant Parra orchestrated the

20  attack is that inmates Valdivia and Trejo later told him that defendant Parra had instructed them

21  to assault plaintiff.  (Id. at 203.)  Inmate Trejo later told plaintiff that defendant Parra told Trejo

22  and Valdivia that plaintiff was informing on the Two-Five prison gang and that he was dropping

23  kites on them.  (Id. at 204-05.)

24          For the following reasons, the undersigned finds that whether defendant Parra had

25  knowledge of plaintiff's lawsuit filed against defendant Guzman is disputed.

26          Defendant claims that he had no knowledge of the lawsuit.  In contrast, plaintiff testified

27  that sometime during the two months prior to the attack, defendant Parra told plaintiff that he

28  would have to "put his boots on" if he kept suing CDCR.  The only lawsuit plaintiff had at the

1   time concerning prison conditions was his lawsuit against defendant Guzman in Lassen County.

2   Based on these circumstances, it is reasonable to infer that defendant Parra was referring to

3   plaintiff's suit against defendant Guzman.  Plaintiff also claims that defendant Parra knew about

4   his lawsuit after listening in on his telephone conversation with his lawyer just hours before the

5   assault.  While plaintiff's deposition testimony does not clearly demonstrate that defendant Parra

6   listened to the phone conversation between plaintiff and his lawyer, plaintiff testified at his

7   deposition that after hanging up with his attorney, he told defendant Parra that he knew that he

8   had listened in on the conversation where he discussed his lawsuit.

9       Whether defendant Parra took an adverse action against plaintiff, i.e., orchestrated the

10  assault, is also disputed.  Defendant Parra denies that he orchestrated the attack.  In his

11  declaration, defendant Parra suggests that he opened all of the cell doors at one time to release the

12  inmates to yard.  Defendant states that when he opened the cell doors, inmates Trejo and

13  Validivia were coming down the B section staircase and then ran to plaintiff's cell.

14      In contrast, plaintiff alleges that defendant Parra opened his cell door last, and that when

15  he did so, defendant Parra could see inmates Trejo and Valdivia standing right outside his cell.

16  Based on these alleged circumstances, and defendant Parra's alleged earlier threat to plaintiff for

17  pursuing his lawsuit, plaintiff has presented sufficient facts to create a dispute regarding whether

18  defendant Parra orchestrated the assault on plaintiff by inmates Trejo and Valdivia in retaliation

19  for plaintiff's lawsuit against defendant Guzman.

20      Defendants also observe that plaintiff claims that inmates Trejo and Valdivia told him that

21  defendant Parra told them that plaintiff was informing on the Two-Five prison gang.  Thus,

22  defendants argue, there is no evidence that defendant Parra ordered the assault on plaintiff

23  because of his protected activity, i.e., pursuing his lawsuit against defendant Guzman.  Assuming

24  that informing on the Two-Five gang was not protected activity, plaintiff is claiming that

25  defendant Parra gave inmates Trejo and Valdivia a reason to attack plaintiff in order to pursue

26  defendant's goal of retaliating against plaintiff for filing his lawsuit against defendant Guzman.

27  That defendant Parra gave inmates Trejo and Valdivia a reason to attack plaintiff that was

28  inconsistent with his own retaliatory motive does not undermine plaintiff's retaliation claim.

25

1    Because of the disputed facts, the undersigned finds that defendant Parra should not be

2    granted summary judgment as to this claim.

3    C. Qualified Immunity

4    Defendants argue that they are entitled to qualified immunity.

5    In analyzing a claim of qualified immunity, a court must examine (1) whether the facts as

6    alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct violated a

7    constitutional right, and (2) if a constitutional right was violated, whether, "in light of the specific

8    context of the case," the constitutional right was so clearly established that a reasonable official

9    would understand that what he or she was doing violated that right.  See Saucier v. Katz, 533 U.S.

10   194, 201–02 (2001).  If no constitutional right was violated, the inquiry ends and the defendant

11   prevails.  Saucier, 533 U.S. at 201.

12   To meet the "clearly established" requirement, "[t]he contours of the right must be

13   sufficiently clear that a reasonable official would understand that what he is doing violates that

14   right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This requires defining the right

15   allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  Id.

16   "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

17   reasonableness is judged against the backdrop of the law at the time of the conduct."  Brosseau v.

18   Haugen, 543 U.S. 194, 198 (2004).

19   Courts are not required to address the two inquiries in any particular order.  Rather, courts

20   may "exercise their sound discretion in deciding which of the two prongs of the qualified

21   immunity analysis should be addressed first in light of the circumstances in the particular case at

22   hand."  Pearson v. Callahan, 555 U.S. 223, 243 (2009).

23   Turning first to defendant Guzman, taking the facts in the light most favorable to plaintiff,

24   the undersigned finds that defendant violated plaintiff's Eighth Amendment rights.  According to

25   plaintiff, defendant Guzman shot him in the head as he was attacked by inmate Haxton.  Plaintiff

26   claims that he was standing at the time defendant shot him, i.e., not falling.  Intentionally shooting

27   an inmate in the head, while he is being attacked by another inmate, is sadistic and malicious.

28   Turning to the second prong of the qualified immunity analysis, the undersigned finds that a

26

1   reasonable officer would know that shooting an inmate under these circumstances violates the

2   Eighth Amendment.  Accordingly, defendant Guzman is not entitled to qualified immunity.

3       As for defendant Parra, taking the facts in the light most favorable to plaintiff, defendant

4   Parra violated plaintiff's constitutional right not to be retaliated against by having inmates Trejo

5   and Valdivia attack him in retaliation for his filing a lawsuit against defendant Guzman.  A

6   reasonable officer would know that setting plaintiff up to be attacked under these circumstances

7   violated plaintiff's constitutional rights.  Accordingly, defendant Parra is not entitled to qualified

8   immunity.

9       C.  Negligence Claim Against Defendant Guzman

10      Defendants argue that plaintiff's negligence claim against defendant Guzman is barred by

11  the applicable statute of limitations.

12      California's Tort Claims Act requires that a tort claim against a public entity or its

13  employees be presented to the California Victim Compensation and Government Claims Board

14  ("Board"), formerly known as the State Board of Control, no more than six months after the cause

15  of action accrues.  Cal. Gov't. Code §§ 905.2, 910, 911.2, 945.4, 950–950.2.  Presentation of a

16  written claim, and action on or rejection of the claim, are conditions precedent to suit.  State v.

17  Superior Court of Kings Cnty. (Bodde ), 32 Cal.4th 1234, 1245 (2004); Mangold v. Cal. Pub.

18  Utils. Comm'n, 67 F.3d 1470, 1477 (9th Cir. 1995).  To state a tort claim against a public

19  employee, a plaintiff must allege compliance with the Tort Claims Act.  Bodde, 32 Cal.4th at

20  1245; Mangold, 67 F.3d at 1477; Karim–Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 627

21  (9th Cir. 1988).  Generally, the lawsuit must be commenced within six months of the notice

22  rejecting the claim.  Cal. Gov. Code §§ 913, 945.6; Cal. Code Civ. Proc. § 342; Shirk v. Vista

23  Unified School Dist., 42 Cal.4th 210, 209 (2007).

24       Defendants argue that plaintiff did not file the instant action within six months of the

25  rejection of his claim by the Board.  Defendants state that the Board rejected plaintiff's claim on

26  February 24, 2012, and plaintiff was informed that he had six months from the date of the

27  rejection letter to file a civil lawsuit.  (ECF No. 50-13 at 91.)  Plaintiff had until August 24, 2012

28  to file a timely lawsuit.  Defendants argue that plaintiff's negligence claim is not timely because

1   plaintiff did not file the instant action until July 16, 2013.

2          Defendants also argue that plaintiff's action filed in the Lassen Superior Court did not toll

3   the statute of limitations.  Plaintiff filed this state court action on May 12, 2012. (ECF No. 50-13

4   at 103.)  On April 4, 2013, plaintiff voluntarily dismissed this action.  (Id. at 111.)

5          In her declaration filed in support of the summary judgment motion, defense counsel

6   describes the state proceedings:

> I was the DAG assigned [to] defend CDCR staff and the prison in
> plaintiff's earlier state action.  During the course of the litigation,
> including discovery, plaintiff asserted that he was pursuing an
> excessive force claim under 42 U.S.C. § 1983 against Guzman and
> a failure to protect claim against Officer Mejia.  During the case
> management hearings, the superior court informed plaintiff that his
> complaint did not adequately allege a cause of action for excessive
> force under 42 U.S.C. § 1983.  Also, Mejia was never named or
> served as a defendant.  Despite being informed of these defects in
> his pleadings, plaintiff did not seek to amend the complaint.
> Instead, he continued to pursue his state action, including
> propounding exhaustive discovery requests related to his cause of
> action against Guzman.   After several months of discovery,
> plaintiff, through his then-attorney of record, dismissed the state
> action without requesting a waiver of costs or an agreement to toll
> the statute of limitations.

16  (ECF No. 50-12 at 3.)

17         California has developed a three-pronged test for invocation of the doctrine of equitable

18  tolling: there must be "(1) timely notice to the defendant in the first claim; (2) lack of prejudice to

19  [the] defendant in gathering evidence to defend against the second claim; and, (3) good faith and

20  reasonable conduct by the plaintiff in filing the second claim."  Donoghue v. County of Orange,

21  848 F.2d 926, 931 (9th Cir. 1987) (citing Collier v. City of Pasadena, 142 Cal.App.3d 917, 922-

22  24 (1983)).

23         Defendants do not argue that they did not receive timely notice or were prejudiced.  Citing

24  Martell v. Antelope Valley Hosp. Med. Ctr., 67 Cal.App.4th 978, 982 (1998), defendants argue

25  that, as a matter of law, actions voluntarily dismissed do not toll the statute of limitations.

26         In Estate of Blue v.County of Los Angeles, 120 F.3d 982 (9th Cir. 1997), the plaintiff

27  argued that the voluntary dismissal of its previously filed federal action tolled the statute of

28

1    limitations under California law.  The defendants argued that plaintiff did not meet the "good

2    faith and reasonable conduct" requirement for equitable tolling.

3        In Estate of Blue, The Ninth Circuit stated that it did not decide whether the simple fact

4    that a plaintiff voluntarily dismissed a claim necessarily prevented the application of equitable

5    tolling under California law.  Id. at 985 (citing Appalachian Ins. Co. v. McDonnell Douglas

6    Corp., 214 Cal.App.1 (1989) (holding that prompt and good faith voluntary dismissal of

7    improperly removed action did not preclude application of equitable tolling).  "Nonetheless, we

8    do not believe the California Supreme Court would use Appalachian to apply equitable tolling in

9    cases where a claim had been pending for a long period and was then voluntarily dismissed and

10   refiled, e.g., Bacon, 843 F.2d at 374-75, or where the plaintiff delayed proceeding on the claim,

11   e.g., Ervin, 848 F.2d at 1020."  Id.  "Those circumstances generally indicate that the plaintiff, as

12   here, was not acting reasonably and in good faith."  Id.

13       In finding that the plaintiff did not meet the "good faith and reasonable conduct

14   requirement," the Ninth Circuit in Blue noted that the plaintiff had an opportunity to litigate its

15   civil rights claims in the voluntarily dismissed action.  Id. at 984.  "Neither the court nor the

16   defendants created barriers to obstruct a resolution of the claims on the merits."  Id.

17       In the instant case, plaintiff dismissed his state court action 11 months after he filed it, and

18   after conducting extensive discovery.  Plaintiff also took no steps to amend his state court

19   complaint after being notified of the pleading defects.  These circumstances do not demonstrate

20   that plaintiff acted reasonably or in good faith in filing the instant action.  In his opposition,

21   plaintiff argues that he followed the advice of counsel in dismissing his state law action.

22   Plaintiff's decision to follow counsel's advice, without further explanation, does not warrant

23   tolling.  For these reasons, plaintiff is not entitled to equitable tolling for the time his state court

24   action was pending.  Plaintiff makes no other arguments in support of equitable tolling.

25       In his opposition, plaintiff also argues that his negligence claim against defendant Guzman

26   is timely because he filed this action within the more lengthy statute of limitations allowed for

27   section 1983 actions.[4]  Plaintiff's argument is without merit.  Unlike section 1983, which does not

---

28   [4]  The statute of limitations for a § 1983 action, as well as any tolling of the limitations period, is

1   contain a limitations period, California has provided for a specific statute of limitations governing

2   claims brought against public entities or their employees.  Lucchesi v. Bar–O Boys Ranch, 353

3   F.3d 691 (9th Cir. 2003) (citing Silva v. Crain, 169 F.3d 608, (9th Cir. 1999)) (Section 945.6 is a

4   special statute of limitations which governs claims under the Government Claims Act).

5   Plaintiff also argues that the period to file his state law claims was tolled under California

6   Code of Civil Procedure § 352.1, which provides for two years of tolling for actions filed by

7   incarcerated prisoners.  Plaintiff is incorrect.  Prisoners are not entitled to tolling based on their

8   incarceration for the limitations period provided for in California Government Code § 945.6.  See

9   Moore v. Twomey, 120 Cal.App.4th 910 (2004).

10   Plaintiff's negligence claim against defendant Guzman is time barred because plaintiff did

11   not file this action within six months of the denial of his claim by the Board.  For these reasons,

12   defendant Guzman should be granted summary judgment as to plaintiff's negligence claim.

13   Defendant Guzman also moves for summary judgment as to the merits of plaintiff's negligence

14   claim.  The undersigned need not address this argument because the negligence claim is time-

15   barred.

16   VI.  Plaintiff's Motion to Amend

17   In the motion to amend, plaintiff argues that defendants claim that defendant Mejia has

18   not appeared in this action.  Plaintiff requests leave to file an amended complaint naming

19   defendant Mejia.

20   As observed by defendants in their opposition, defendant Mejia has appeared in this action

21   and defended against it.  The motion for summary judgment was filed on defendant Mejia's

22   behalf.  Because defendant Mejia has appeared in this action, plaintiff's motion to amend is

23   denied as unnecessary.

24   determined by state law. Wilson v. Garcia, 471 U.S. 261, 275 (1985), superseded by statute on
     other grounds as stated in Pony v. County of Los Angeles, 433 F.3d 1138, 1143 (9th Cir. 2006).

25   In California, the statute of limitations for personal injury actions is two years.  Cal. Civ. Proc.
     Code § 335.1.  Further, if the plaintiff is incarcerated, California law provides for tolling the

26   statute of limitations for up to two years.  See Cal. Civ. Proc. Code § 352.1(a) ("If a person
     entitled to bring an action ... is, at the time the cause of action accrued, imprisoned on a criminal

27   charge, or in execution under the sentence of a criminal court for a term less than for life, the time
     of that disability is not a part of the time limited for the commencement of the action, not to

28   exceed two years.").

1     Accordingly, IT IS HEREBY ORDERED that:

2     1. Defendants' motion for an extension of time to file a reply (ECF No. 61) is granted;

3     2. Plaintiff's motion to amend (ECF No. 59) is denied; and

4     IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF

5   No. 50) be granted as to defendants Mejia, Vincent, Smith and Bargarin, and as to plaintiff's

6   negligence claim against defendant Guzman; and denied as to plaintiff's federal claims against

7   defendants Guzman and Parra.

8     These findings and recommendations are submitted to the United States District Judge

9   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

10  after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

13  objections shall be filed and served within fourteen days after service of the objections.  The

14  parties are advised that failure to file objections within the specified time may waive the right to

15  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  Dated:  April 17, 2015

17

18                                          KENDALL J. NEWMAN
                                            UNITED STATES MAGISTRATE JUDGE
19

20

21  Cor1551.sj

22

23

24

25

26

27

28

31